In the Matter of the OLD REPUBLIC LIFE INSURANCE COMPANY et al., Respondents, *v.* JULIUS S. WIKLER, as Superintendent of Insurance of the State of New York, Appellant.

Third Department, February 23, 1961.

*Louis J. Lefkowitz, Attorney-General* (*Samuel A. Hirshowitz* and *Paxton Blair* of counsel), for appellant.

*Aranow, Brodsky, Bohlinger, Einhorn & Dann*; *Hodges, Reavis, McGrath & Downey* (*John P. McGrath* and *Alfred A. Bohlinger* of counsel), for respondent.

BERGAN, P. J. As a result of a need for closer public control over credit life insurance demonstrated in the studies and hearings of its Joint Committee on Commerce and Economic Development, the Legislature in 1958 amended sections 154 and 204 of the Insurance Law to broaden in the field of credit life insurance the powers of the Superintendent of Insurance. (L. 1958, ch. 683.)

Credit life insurance is an almost universal element of modern installment buying. It is written as group insurance "to pay off the unpaid time balance of a retail instalment contract in case of the buyer's death" (statement of Attorney-General Lefkowitz before the committee, 1958 Report of Joint Legis. Comm., N. Y. Legis. Doc., 1958, No. 84, p. 66).

The Attorney-General observed that "initial premiums for group creditor's life insurance vary without apparent reason" and "[t]he excess" over the insurance company's costs and normal profit "is usually returned to the financial agency [the insured's creditor] in the form of a dividend — no part of which is given to the consumer". Issuance of insurance, he continued, on such a wholesale basis "does not justify" insurance pre-

miums fixed as though the insurance " will be sold, so to speak, at retail " (p. 70).

The Legislature had before it extensive material dealing with the problem of linking life insurance and accident and health insurance to installment credit; and this evidence led to the enactment of the 1958 amendments to the Insurance Law.

In this article 78 proceeding which attacks the basic power of the Superintendent of Insurance under the statute to promulgate a regulation on this subject, the Superintendent's answering affidavit read at Special Term described the enactment by the Legislature of the 1958 amendments as having been designed " to overcome abuses " which were " found to have developed " in this field of life insurance.

The Superintendent's affidavit which was before the Special Term and is before us on appeal, seems a significant commentary on the background of the statutory enactment in New York. Two paragraphs throw special light on the problem:

" Such abuses have been the source of grave concern, over a period of several years to the Insurance Department, various legislative committees, and the National Association of Insurance Commissioners.* Reports and studies of the business of credit insurance by these bodies document the fact that the creditor occupies a dominant position in the marketing of insurance in conjunction with credit transactions, and, in view of the inferior bargaining position of the debtor, has been able to dictate the debtor's choice of insurance coverage, premium rates, insurer and agent.

" Clearly undesirable practices in this ' captive market ' have included the placement of credit insurance in excessive amounts, and at excessive rates of premium bearing no reasonable relationship to the benefits to be derived from such insurance;

---

* The affidavit cited the following material in substantiation: " The Tie-In Sale of Credit Insurance in Connection with Small Loans and Other Transactions", a report of the Subcommittee on Antitrust and Monopoly Legislation of the Committee on the Judiciary, United States Senate (83rd Cong. 2nd sess.) (Washington, D. C.: U. S. Government Printing Office, 1955); "National Association of Insurance Commissioners Study on Credit Life and Credit Accident and Health Insurance." Proceedings of N. A. I. C. 1958 (Vol. 1, pp. 113–135); Report of the Joint Legislative Committee on Commerce and Economic Development, State of New York Legislative Document (1958) No. 84; Report on Insurance Charges in Consumer Credit Transactions by F. Roger Downey, New York State Insurance Department, January 24, 1957; Report of Inter-Departmental Committee (Consumer Counsel, Superintendent of Banks and the Superintendent of Insurance) on Insurance Sold in Connection with Installment Sales and Related Matters, January 30, 1958; An Analysis of the Licensed Lender Industry 1945–1957, Banking Department, State of New York.

coercion and intimidation to force such insurance upon the debtor; failure to inform the debtor of the actual cost of such insurance; allowance of unwarrantedly high rates of commission; and avoidance of claims by failure to furnish the debtor with evidence of his coverage. In the instance of installment purchasing, a debtor has often been forced to pay for nonessential items concealed as unidentified extra charges under the heading of insurance."

The report of the legislative committee demonstrated that consumer installment credit in 1957 had reached $34.1 billion and that the Federal Reserve had estimated that more than 50% of all families were making payments on installment debts, often exceeding 20% of the total family income.

The 1958 amendments were expressly designed to enlarge the powers of the Superintendent of Insurance over this area of life insurance. Whatever may have been and remains the limitations of control by the Superintendent over the rate of premiums for life insurance generally in the long legislative and public controversy on the subject, the 1958 amendments gave the Superintendent a firm grip on premium rates for credit life insurance.

Section 204 (subd. 1, par. [c]) was amended to provide in explicit language that the " premium rates " for credit life insurance which the insurer was required to file " shall be subject to his [the Superintendent's] approval ".

The amended statute provided other things about approval of " forms " following the traditional pattern of regulating life insurance companies; but even as to contract forms the amendment (§ 204, subd. 1, par. [c]) provided, in the words of a negative mandate, that the Superintendent " shall not approve " forms filed " if the premium charged is unreasonable in relation to the benefits provided." This constituted an additional and separately delegated statutory power in respect of premiums.

When this language addressed to policy forms is seen in contrast with the pre-existing and general authority of the Superintendent over life insurance policy forms, a difference both in emphasis and in authority is at once apparent.

That general power in subdivision 1 of section 154 was, and is, that the Superintendent " may " disapprove the form of policy " if the benefits provided therein are unreasonable in relation to the premiums charged."

The added subdivision 7 of section 154 tells him he " shall not " approve of the credit insurance policy form and shall not approve " premium rates " if " such premium rates are unreasonable in relation to the benefits provided ". This is something

different from his general powers under section 154; and it is especially something different in the context of an entirely new power to approve "premium rates" set up by the amendment to section 204.

In the words of the legislative committee which recommended the 1958 legislation to broaden the Superintendent's power over rates, the "expansion" of the "existing law" was intended "to bring cheaper group creditor life insurance to more people". (1958 Report of Joint Legis. Comm., p. 73).

. These statutory amendments became effective October 1, 1958. In response to the new powers given, the Superintendent promulgated and filed with the Secretary of State, August 28, 1958, Regulation No. 27A dealing with credit life, accident and health insurance, to become operative in respects material to the amended statute, at the same time the statute took effect.

The regulation was promulgated after a hearing at which "all segments of industry and the public were given full opportunity to express their views on the proposed Regulation. The petitioners, among others, appeared and submitted their views at that time." This appears in the affidavit of the Superintendent attached to the answer and is not factually controverted by petitioner.

The regulation, promulgated by the Superintendent in August, 1958, fixed a schedule for premium rates for credit life insurance which the Superintendent found "adequate and not unreasonable in relation to the benefits provided" and it announced to insurance companies doing this kind of business that "[n]o proposed filing of premium rates" exceeding the schedule "shall be approved".

Without filing or offering to file any premium rates or proposed forms of policies, the petitioners promptly instituted this proceeding to annul the regulation by an order to show cause returnable at Special Term, October 10, 1958.

The petitioner Old Republic Life Insurance Company alleges that its premiums in New York on credit life insurance and other credit insurance in 1957 "were substantially in excess" of $1,000,000 and the petitioner Credit Life Insurance Company alleges its New York premiums on similar business were in the same year in excess of $800,000.

The Superintendent revised the regulation after petitioners began this proceeding attacking it. On December 5, 1958 it was amended, among other things, to provide that none of its provisions are to be deemed mandatory if the insurer shows that the charges are "reasonable in relation to the benefits provided". By amended pleading the petitioners continued their

attack on the power of the Superintendent to promulgate the regulation as thus revised.

The court at Special Term on the papers before it granted petitioners relief in full scope and annulled the regulation because the court was of opinion that the 1958 statutory amendments did not confer on the Superintendent " the power and jurisdiction to fix maximum rates ". We take another view of the case; and we treat the amended petition as insufficient in law to entitle petitioners to any relief.

The main thrust of the petitioners' argument attacking both the original and the amended regulation is that the Superintendent had no statutory power to " fix " or to " make " premium rates; that the regulation " fixed " rates; therefore it is invalid.

It has been seen that the Special Term took this view, noting that respondent had no power " to fix " maximum rates. At the opening of its argument petitioners' brief asserts that " The Superintendent can point to no express statutory provision empowering him to make rates ".

Of course, literally under the amended statute a proposal for minimum rates is made by an insurer to the Superintendent; and in this sense, and at that stage, the Superintendent does not " make " rates. But his power under the statute to disapprove premium rates proposed by an insurer which he finds to contravene the public policy of New York is so inclusive as to be plenary.

All premium rates for this class of insurance, as we have seen, " shall be " subject to the Superintendent's " approval " and the legislative direction to disapprove, not a mere power, but a mandate, is to be exercised if the premium charged is unreasonable in relation to the benefits charged. In the words of the statute (§ 204, subd. 1, par. [c]) in such a case he " shall not approve ".

Whether this be read or not as a literal power to fix or make a premium rate, inescapably it must be read as a power to unfix a rate and unmake a rate proposed by an insurer and prevent the sale of a policy in New York based on any such rate.

Thus the power to make wholly inoperative a premium rate proposed by an insurer is manifest; and while this in form may be a vetoing or negativing form of public power, it is clear that no effective or lawfully chargeable premium rate can come into existence without the affirmative act of the Superintendent. Whether the Superintendent makes rates, or allows rates which he approves to come into force, seems something of an exercise in semantics.

In any case it would be difficult to demonstrate how an announcement in advance of the Superintendent's views of what rates would be deemed excessive could be anything but helpful to an insurer intending to propose rates; if there were also open to him the usual avenues of review. Here the amended regulation permits an insurer to show that a rate differing from the announced maximum would be reasonable; and the court would require that he have that right whether or not the regulation expressly allowed it.

Very heavy reliance is placed by the petitioners on the decision of this court in *Matter of National Bur. of Cas. Underwriters* v. *Superintendent of Ins.* (6 A D 2d 73, reversed on motion by respondents in the Court of Appeals on the ground the issue had become moot, 6 N Y 2d 842). The decision is not in point. In *National Bureau* the court decided a very narrow legal question, i.e., whether there was substantial evidence in the quasi-judicial proceedings before the Superintendent to sustain his finding upon which disapproval of the petitioners' proposed rates for automobile liability insurance was based.

The court held on that record there was no substantial evidence to support the determination, and thus annulled and remitted to the Superintendent for further proceedings. But in the case before us there is no filing of rates; no administrative hearing on the fairness or adequacy of any rates proposed by these petitioners. What is before us is a regulation announcing in advance what premium rates the Superintendent will deem reasonable; and if he has the power to make such an announcement the petitioners make out no case in this proceeding.

The power to lay down reasonable standards for the guidance of hearing officers and applicants would be implicit in an area of regulation where a public officer had a duty to disapprove premium rates deemed unreasonable in relation to the benefits provided, and expressly making all such rates " subject to " his approval.

Indeed, in this very statutory context, power was granted to the Superintendent to " prescribe " in writing " official regulations " in respect of credit insurance (§ 154, subd. 7, 2d par.). This was a power appended to the broad authority to prescribe official regulations granted in section 21, which, among other things (subd. [b]), authorizes official regulations " effectuating any power, given to him under the provisions of this chapter ".

A standard announced in advance is often in aid of sound administration and the fair exercise of public power. Thus in *Gair* v. *Peck* (6 N Y 2d 97) the general basis for reasonable fees charged by lawyers in personal injury cases was laid down

by the Appellate Division in a schedule which it announced would be applied in the exercise of discipline over the profession. The Court of Appeals approved the regulatory rule as a proper exercise of the power although the matter of fees between attorneys and adults of competent mind had long been left to private contract.

There are many situations in which the promulgation of a "general rule" by a regulatory agency is the fairest way to lay down the ground rules of regulation. See, for example, the discussion by Mr. Justice FRANKFURTER in *Securities Comm.* v. *Chenery Corp.* (318 U. S. 80, 92). A standard for the implementation of an authority conferred on the Commissioner of Education and the Regents much more onerous than the one now before us, and which had been literally followed by the public authority was approved in *Matter of Marburg* v. *Cole* (286 N. Y. 202). (See, also, *Matter of Ben-Su-Si Realty Corp.* v. *Coster*, 276 App. Div. 1096; 73 C. J. S., Public Administrative Bodies and Procedure, § 93, p. 411.) Of some collateral interest, but not precisely in point, see *Matter of Ross* v. *Macduff* (309 N. Y. 56) on the "point system" for motor vehicle license revocation.

The history of events and economic and business practices which led to the enactment of the 1958 amendments to the Insurance Law and the words of the statute itself leave us in no doubt. The Superintendent of Insurance has, as we have suggested, both the power and the duty to see to it that the premium rates charged on credit life insurance are reasonable.

Here petitioners show nothing that entitled them to judicial relief. The basic power of the Superintendent to promulgate the regulation which they attack, we find to be well grounded on statute law; and no demonstration whatever is made that the rates announced in the regulation are arbitrary or unreasonable; nor have petitioners shown in any justiciable sense they are aggrieved by them.

The order annulling the regulation of the respondent should be reversed on the law and the cross motion of respondent to dismiss the petition granted, with $50 costs.

COON, GIBSON, HERLIHY and REYNOLDS, JJ., concur.

Order annulling the regulation of the respondent unanimously reversed on the law and the cross motion of respondent to dismiss the petition granted, with $50 costs.